DeVaughn *et al. vs.* McLeroy *et al.*

# DeVaughn *et al. vs.* McLeroy *et al.*

| 82 | 687 |
|----|-----|
| 86 | 545 |
| 82 | 687 |
| 91 | 549 |
| 82 | 687 |
| 99 | 148 |
| 99 | 447 |
| 82 | 687 |
| 102 | 468 |
| 82 | 687 |
| 103 | 488 |
| 103 | 773 |
| 105 | 528 |
| 105 | 533 |
| 82 | 687 |
| 106 | 648 |
| 82 | 687 |
| a111 | 116 |
| 82 | 687 |
| 112 | 698 |
| 82 | 687 |
| 114 | 459 |
| 82 | 687 |
| 116 | 252 |
| 82 | 687 |
| 118 | 475 |
| 82 | 687 |
| e119 | 194 |
| 119 | 532 |
| 82 | 687 |
| 122 | 75 |
| 122 | 616 |
| 123 | 294 |
| 123 | 350 |
| 82 | 687 |
| 125 | 707 |
| 82 | 687 |
| 128 | 276 |

A testator, who died in 1853, devised to his wife a sum of money, and directed that his executor buy land with it for her, the property to go to her for life, and after her death, to be equally divided among all of testator's children, and in case she remarried, the executor to assume its management for her benefit and that of testator's minor children. The executor purchased the land, taking the deed " to himself as executor, his heirs and assigns," and put the widow in possession. On December 27, 1866, in pursuance of an award under arbitration proceedings of that date, the widow sold her interest in the land to the executor, who also received a deed to which was signed the names of P. M. McLeroy, J. W. McLeroy and Mrs. Travis (children of testator) and of one Gay, who had married another of his daughters, she being then in life but not signing the deed. Afterwards the executor went into bankruptcy, returning the land as part of his assets; and his assignee, by order of court, sold it to a corporation which held a mortgage on it from the executor individually. The executor died in 1883, and there has been no representation on his estate, and no further representation on the estate of testator, whose widow died in 1885. Afterwards Mrs. Gay, P. M. and J. W. McLeroy, Mrs. Allen (formerly Travis), and the sole heirs of two other children of testator, commenced their joint action in the statutory form for the recovery of the land, against the tenants in possession and the corporation.

*Held,* 1. The land having been identified as that which the executor bought under testator's direction, and the heirship of plaintiffs having been shown, it was not error to overrule a motion for a nonsuit, made on the ground of lack of identification of the premises. Testimony was afterwards introduced by the defendants, showing such identity and the interest of plaintiffs.

2. The effect of testator's direction to invest the money in land for his widow for life, was to convert the money into land from his death. And his direction to sell the land after her death and divide the proceeds among his children, converted the land into personalty from her death.

(*a*) The estate taken by his children was a vested remainder, which was not changed to a contingent one by the direction to sell the land when the life tenant died.

(*b*) The remaindermen could make a reconversion from personalty to land by electing, after the death of the life tenant and before its conversion *de facto*, to take the land instead of its proceeds. Such election must be made by all who are entitled to the property. The defendants having bought it as land and having demised and holding it as such, and the suit being for it and not its proceeds, it must be treated as land from the time of such election.

3. Under the will, the executor was not a trustee otherwise than as executor; and the trust continued during the life tenancy, but did not necessarily extend beyond it. Therefore the legal title and right of possession of their undivided interest became vested in plaintiffs as remaindermen and cotenants upon the death of the life tenant, which gave them the right to bring ejectment, unless the defences hereafter considered interposed a bar.

4. The arbitration proceedings were instituted under the provisions of §§4134, 4156 of the code of 1863. The submission shows that the controversy was between the widow, individually and as guardian, and her wards (two of testator's children), concerning her illegal loan of their money to J. W. McLeroy and Gay, and her expenditure of it on her own account. Her bondsman, who was the executor, was a party to the arbitration, and no next friend or guardian *ad litem* was appointed to represent the interest of the wards, and as to them the entire arbitration was a nullity.

(a) The award was not rendered binding on them by its entry on the minutes of the superior court, that court having, under it, no jurisdiction of the persons and subject-matter.

(b) The arbitration proceedings were also void as against P. M. Mc-Leroy and Mrs. Travis, whose names appear as subscribers to the submission, as both of them testified that they did not sign the submission nor authorize any one to do so for them, and that they had no knowledge of the arbitration until just prior to the commencement of this suit; and there was no evidence to the contrary.

(c) Grounds of a motion for a new trial not certified to be true cannot be considered.

(d) To bind one by ratification of an illegal or void act, it must be shown that he had full knowledge at the time of the alleged ratification of the facts which would make such act illegal or void; and the burden of proving a ratification is on the party asserting it.

(e) While it was agreed in the submission to arbitration that the executor would buy the life interest of the widow and pay over the consideration to the wards if the entire remainder was also conveyed to him, the arbitrators did not so direct. The award shows that the arbitrators, in considering the rights of the wards, confined their decision to what the guardian and those to whom she had loaned her wards' money should pay the wards in satisfaction of their money demands; and is wholly silent as to their remainder interest in the land now sued for. Hence a ratification of the award to the extent of his interest therein by one of the wards, cannot deprive him or his heirs of the right to sue for his remainder interest in the land.

(f) No evidence was introduced showing that. P. M. McLeroy and Mrs. Travis had done anything by way of ratification of the award;

and even had they received a portion of the money thereunder with knowledge of the fact, that would have been a ratification only to the extent of estopping them from suing the guardian or her bondsmen, and the borrowers, for their portion of the money, because no other interest of theirs was passed upon by the award.

(g) An affidavit of forgery of a deed is not proof, but only forms the issue on that question; it leaves the burden of proof on the party offering the deed, who must prove its execution as if it had not been recorded.

5. Mrs. Allen having married her first husband before the passage of the "married woman's act" of 1866, and having survived him without his making a reduction of her interest in the property in dispute into his possession, and having married Allen after the passage of that act, is entitled to her interest in it in her own right, as if she had never married. As Gay had the power, before that act, to make an assignment of his wife's remainder interest so as to operate as a right in his assignee to reduce her interest into possession when the life-tenancy terminated, provided he was then in life as husband, he could exercise the same power after the passage of that act, which was not intended by retrospection to impair any existing rights of the husband over the wife's property.

6. One of the plaintiffs not being entitled to recover, a verdict for all of them was contrary to law.

July 31, 1889.

Nonsuit. Wills. Remainders. Election. Trusts. Executors and administrators. Estates. Arbitration and award. Guardian and ward. Practice. Ratification. Deeds. Forgery. Burden of proof. Husband and wife. Tenants in common. Parties. Title. Verdict. Before Judge RICHARD H. CLARK. Clayton superior court. March term, 1888.

Reported in the decision.

HILLYER & BROTHER and W. L. WATTERSON, for plaintiffs in error.

HALL & HAMMOND and BIGBY & DORSEY, *contra.*

SIMMONS, Justice.

Henry McLeroy died testate in 1853. By the third

v 82-44

item of his will, he devised the land which he directed
his exectuor to buy, to his wife for and during her nat-
ural life, and after her death (whether she remarried or
not) directed that the land be sold and the proceeds
divided equally among all his children; and in case his
widow remarried, the executor should assume the man-
agement of said property for the benefit of his widow
and minor children.   The executor purchased the land,
and had the deed made "to himself as executor, his
heirs and assigns," and put the widow in possession of
said land.   On December 27th, 1866, in pursuance of an
award under arbitration proceedings of that date (the
facts of which are specifically set forth hereinafter in the
opinion thereon) the widow sold her individual interest
in the land to the executor, M. B. DeVaughn; and the
latter also received a deed to which was signed the
name of W. J. Gay, who had married Pelletiah, one of
the testator's daughters, Pitt M. McLeroy, Martha F.
Travis and J. W. McLeroy.   Mrs. Gay, though in life
at the time, did not sign the deed; and Pitt M. McLeroy
and Martha F. Travis filed affidavits that their signa-
tures to the deed were forgeries.   M. B. DeVaughn
afterwards failed in business and went into bankruptcy.
The land in dispute was returned in his schedule as a part
of his assets, and the assignee in bankruptcy, by order
of the United States District Court in Georgia, sold said
land to the Citizens' Bank of Atlanta, which held a
mortgage on said land from DeVaughn.   DeVaughn died
in 1883, and there had been no representative on his
estate, and no further representation upon the estate
of Henry McLeroy, the testator.   The widow, who was
the life-tenant, died in 1885.   After her death, Mrs.
Pelletiah Gay, Pitt M. McLeroy, J. W. McLeroy, Martha
F. Allen (formerly Mrs. Travis), children of Henry Mc-
Leroy; A. P. Martin, sole heir of Emily Martin, who

was a daughter of Henry McLeroy; and Earl and Nannie McLeroy, who were the sole heirs of T. B. McLeroy, son of said Henry McLeroy, commenced their joint action for said land in the statutory form against the tenants in possession and the Citizens' Bank. Pending the suit and before trial, Mrs. Gay died, and her husband, W. J. Gay, administered on her estate, and was made a party plaintiff in her stead. The plaintiffs relied on the will of Henry McLeroy, the deed to the executor, and J. W. McLeroy's testimony, which identified the land sued for and established the heirship of the plaintiffs. This witness, who had sold his interest in the land to the executor, was, by leave of the court, withdrawn as a party plaintiff.

Upon the close of the plaintiffs' evidence, the defendants moved for a nonsuit, on the grounds that the land was not identified; and that the plaintiffs had shown no remainder interest in it. This motion was overruled by the court. The defendants then introduced the arbitration proceedings, which identify the land sued for, and the deeds of Mrs. McLeroy and others, hereinbefore mentioned, together with the testimony in relation to said proceedings and deeds. Upon the close of the defendants' testimony, the plaintiff introduced evidence in rebuttal. The jury found for the plaintiffs an undivided five sevenths interest in the land, as proved, together with mesne profits; whereupon the defendants moved for a new trial. The court overruled this motion, and the defendants excepted.

1. The first ground of the motion for a new trial which we will consider is that which complains of the refusal of the court to grant a nonsuit on the ground that the proof did not identify the premises in dispute as coming within the descriptive clauses in the will of Henry McLeroy relied on for creating an estate in re-

mainder in favor of plaintiffs. There was no error in refusing to grant a nonsuit on this ground. The testimony of J. W. McLeroy identified the land sued for as that which the executor had bought under the direction of the testator, and his testimony made out a *prima facie* case sufficient to carry the case to the jury. Besides, the arbitration proceedings, and the deed from the life-tenant, with the others which the defendants introduced after their motion for a nonsuit was overruled, are evidence of the identity of the land sued for and the interest of the plaintiffs therein. *Jackson vs. Johnson*, 67 *Ga.* 185; *City of Atlanta vs. Word*, 78 *Ga.* 276. This disposition of the defendants' motion to nonsuit leaves us free to consider the merits of the case.

2. The third item of Henry McLeroy's will forms the basis or common source of title of both parties. So much thereof as is necessary for us to consider reads as follows:

"I give and devise to my wife, Martha McLeroy, . . three thousand dollars in cash, . . and I wish my executor to take the money and buy a settlement of land for my wife, Martha. All the before named property I give to my wife, Martha, for and during her natural life, though if she should marry after my death, I wish my executor to take the management of said property, and apply the income of said property to the best support of my wife and for the raising and educating of my minor children; and after the death of my wife, Martha, I wish the property all sold and equally divided between all my children."

The money which the testator directed to be invested in land for his widow during her natural life, was converted into land from the testator's death, on the principle that the direction to immediately invest money in land or land in money, of which the testator was seized at his death, thereby impresses it with the character of the property into which the conversion is directed to be made as effectually as if he had bought the land and devised it, or had sold the land and be-

DeVaughn *et al. vs.* McLeroy *et al.*

queathed the proceeds. 2 Jarman on Wills (Randolph and Talcott's edition), 170 *et seq.;* Adams, Eq. (7th Am. ed.), m. p. 136; and citations in the notes of these works of numerous English and American authorities: *Shivers vs. Latimer,* 20 *Ga.* 740; Rankin *vs.* Rankin, 36 Ill. 293; 87 Am. Decis. 205; Collins *vs.* Champ's heirs, 15 B. Mon. (Ky.) 118; 61 Am. Dec. 179; Kane *vs.* Gott, 24 Wend. (N. Y.) 641; 35 Am. Decis. 641; Branhall *vs.* Ferris, 14 N. Y. 41; 67 Am. Decis. 113; Proctor *vs.* Ferrebee, 1 Ired. Eq. (N. C.) 143; 36 Am. Dec. 34; Burr *vs.* Sims, 1 Whart. (Pa.) 252; 29 Am. Dec. 48, and note 57; Smilie *vs.* Biffle, 2 Pa. St. 52; 44 Am. Decis. 156, and note 159; Carr *vs.* Branch (Va.) 8 S. E. Rep. 478; Ford *vs.* Ford, (Wis.) 33 N. W. Rep. 188; 70 Wis. 19; 5 Am. St. Rep. 117, and note pp. 141–146. And the testator's direction to sell the land after the death of his widow, and divide the proceeds among all of his children, converted the land again into personalty from *her* death, (Brothers *vs.* Cartwright, 2 Jones Eq. (N. C.) 113, 116; 64 Am. Decis. 563–565; Savage *vs.* Burnham, 17 N. Y. 561, 569; Manice *vs.* Manice, 43 N. Y. 303, 368, 369; Moncrief *vs.* Ross, 50 N. Y. 431, 436; Bunce *vs.* Vandergrift, 8 Paige, top pp. 40, 41; Hemphill *vs.* Moody, 64 Ala. 47; Watson *vs.* Martin, 75 Ala. 506, 509;) although some authorities hold that the reconversion to personalty, as regards the remaindermen's interests, dates from the testator's death. Adams' Eq. (7 Am. ed.) t. p. 136, note 1; McWilliams' Appeal, (Pa.) 11 Atl. Rep. 383; Carr *vs.* Branch, *supra;* Ramsey *vs.* Hanlon, 33 Fed. Rep. 425.

The estate which the testator's children took in the property under the will was a vested remainder. The direction to sell the land when the life-tenant died, while it then converted the character of the property

from land to personalty, did not change the character of the estate from a vested to a contingent remainder, but was intended "to point out an equitable mode of dividing his (the testator's) estate," or as "a mode in which the different shares should come to the remaindermen." *McGinnis vs. Foster*, 4 *Ga.* 377, 380 ; *Legwin vs. McRee*, 79 *Ga.* 430 ; Manice *vs.* Manice, 43 N. Y. 303, 367–8.

The cases of *McGinnis vs. Foster* and *Legwin vs. McRee* do not decide that the remaindermen in those cases took a vested interest in the land *as land.* On the contrary, although the question of conversion was not directly considered, the above quotations from each case show that the court impliedly recognized the doctrine. And when it is said in the first of these cases, on page 380, that the direction to sell the property and divide the proceeds among the remaindermen would not change "the character of the *estate*" given to them, the court evidently had reference to the *interest* in the remainder—that is, whether vested or contingent,—for that was the question the court was then considering; and because "estate is the quantity of interest which an owner has in property," (Code, §2245 ; *Lamar vs. Sheffield*, 66 *Ga.* 711,) while "property includes both realty and personalty." *Ibid.;* Code, §5. Therefore "estate" and the "character of the estate," according to our laws and common understanding, have reference to the *interest* in the property, to wit : an estate for years, an estate for life, an estate in remainder vested or contingent, and an estate in fee-simple ; which shows that while realty and personalty are different kinds of *property,* they are not different kinds of *estates.* There is no question that the remaindermen in the case at bar, as in the case of *McGinnis vs. Foster,* took a vested interest in the property, but that property, under the

intention and direction of the testator, was *personalty* from the death of the life-tenant, if not from his own death, as shown by the numerous authorities already cited.

Still, while this was the character of the property impressed by the testator upon the interest or estate of the remaindermen, it was within the power of the latter to make a reconversion from personalty to land by electing, after the death of the life-tenant and before its conversion *de facto*, to take the land instead of the proceeds thereof. 2 Jarman on Wills (R. and T's ed.), 188, and cases cited in note 6 ; Adams' Eq. (7 Am. ed.), m. p. 137, and note 2 ; *Adams vs. Bass*, 18 *Ga.* 130, 142 ; *Swann vs Garrett*, 71 *Ga.* 566, 569, 570. And as to the general right of devisees and legatees to divide the property among themselves otherwise than as the will directs, see *Hatcher vs. Cade*, 55 *Ga.* 359 ; *Amis vs. Cameron*, 55 *Ga.* 449 ; *Bailey vs. Ross*, 66 *Ga.* 367 ; *Rakestraw vs. Rakestraw*, 70 *Ga.* 806(2) ; *Cutliff vs. Boyd*, 72 *Ga.* 302(5), 313.

The majority of the authorities seem to require the election to be made by all who are entitled to the property. See the Georgia cases just cited ; *Burch vs. Burch*, 19 *Ga.* 174(2) ; 2 Jarman on Wills (R. and T's ed.) pp. 188, 189 ; Adams' Eq. (7 Am. ed.), m. p. 137 ; Note to Ford *vs.* Ford, 5 American St. Reps., p. 147. The text of both Jarman and Adams, as well as the cases cited in the notes thereto, show beyond all dispute that the parties in this case, who are alone entitled to the whole property, have elected to take the land. The defendants bought the land as such ; they have demised and hold it as land ; and the plaintiffs are suing for the land and not for its proceeds. Hence we can reach but one conclusion on this question, and that is, that the subject-matter of this case—the land in dispute—must

be treated as land from the time of such election. Note to Burr *vs.* Sims, 29 Am. Decis. 57.

3. This brings us to a consideration of the time that the trusts under the will continued, and of the person or persons who possessed the legal title and the right of possession upon the death of the life-tenant. As to what are executory trusts during the life-tenancy, see *Liptrot vs. Holmes*, 1 *Ga.* 390; *Edmondson vs. Dyson*, 2 *Ga.* 320; *Blake vs. Irwin*, 3 *Ga.* 345, 368; *Jordan vs. Thornton*, 7 *Ga.*517; *Milledge vs. Bryan*, 49 *Ga.* 397, 410; *Thomas vs. Crawford*, 57 *Ga.* 212-4; *Jennings vs. Coleman*, 59 *Ga.* 718; *Bull vs. Walker*, 71 *Ga.* 195; *Gaboury vs. McGovern*, 74 *Ga.* 133(6, 7, 8), 148; *Rogers vs. Pace*, 75 *Ga.* 436. And as to what are executory trusts after the life-tenancy, see *Edmondson vs. Dyson, supra; Askew vs. Patterson*, 53 *Ga.* 210, 213; *Ford vs. Cook*, 73 *Ga.* 215; *Knorr vs. Raymond*, 73 *Ga.* 767-769.

In all of these cases the property was either given (1) to the executor, or trustee, *in trust* for the life-tenant, with remainder over, which are executory trusts during the life-tenancy; or (2) to the executor or trustee *in trust* for A for life, and after A's death *in trust* for B, which, in case of B's minority or other disability when the life-tenancy ceases, are denominated continuing or executory trusts after the life-tenant's death. We do not think the executor under the McLeroy will was a trustee otherwise than as executor, because the property was not devised to him in trust, or otherwise, to hold or sell. Like most executors, he was invested with certain powers, which, in order to execute the testator's wishes, conferred upon him the legal title, as under the wills construed in the cases of *McGinnis vs. Foster*, 4 *Ga.* 380 *et seq.; Burch vs. Burch*, 19 *Ga.* 185; *Gardner vs. Weeks*, 32 *Ga.* 698; *Dean vs. Feely*, 69 *Ga.* 811, 812; *Swann vs. Garrett*, 71 *Ga.* 566;

*Griffin vs. Fleming,* 72 *Ga.* 697; *Legwin vs. McRee,* 79 *Ga.* 430.

We therefore conclude, from these cases and from those which follow, that the trusts under the will of Henry McLeroy continued during the life-tenancy, but did not extend necessarily beyond it. This being true, where was the legal title upon the death of the life-tenant in 1885? It was not in the heirs of the executor for any purpose, because the will does not put it there; and the fact that the executor bought the land and took the deed to himself as executor, his heirs and assigns, cannot alter the destination given by the will to the property. The executor, at most, was a donee of a power, and he could not confer that power upon his heirs in derogation of the will, for, in the construction of powers, the intention of the donor of the power always governs. *Mackay vs. Moore, Dudley's (Ga.) Rep.* 94, 96; *Berrien vs. Thomas,* 65 *Ga.* 61, 63; *City Council vs. Radcliffe,* 66 *Ga.* 474; Taylor *vs.* Adkins, 1 Burr. 60, 120; Thorley *vs.* Thorley, 10 East, 442–3; Pomeroy *vs.* Partington, 3 Term, 674–8; Daly *vs.* James, 8 Wheat. (U. S.) 535–6; 4 Kent's Com. 345; 2 Perry on Trusts, §769.

And it was not in the testator's estate, so as to make the appointment of an administrator *de bonis non,* with the will annexed, necessary, because the remainder in the property, as given by the testator, not only vested in the children from the testator's death, as decided by the cases of *McGinnis vs. Foster, Legwin vs. McRee* and *Manice vs. Manice, supra;* but, as we have already shown, the direction in the will to sell the property after the life-tenant's death and divide the proceeds among the children, which would be the sole office and performance of an administrator, did not deprive them of the right, when the life-tenant died, to end that

power and any trust as a concomitant thereto, by elect-
ing to take the land instead of its proceeds.

Moreover, even *cestuis que trust*, who are entitled to
possession, can maintain ejectment against a stranger,
or the trustee, who wrongfully withholds the posses-
sion, (*Glover vs. Stamps*, 73 *Ga.* 209 ; 54 Am. Rep. 870 ;
*Blalock vs. Newhill*, 78 *Ga.* 245, 247,) and may, as shown
by the latter case, proceed in such an action, after the
death of their trustee, against any one holding ad-
versely to them.

Hence it follows that the legal title and right of pos-
session to their undivided interests became vested in the
plaintiffs, as remaindermen and cotenants, upon the
death of the life-tenant, which gave them the right to
bring ejectment, unless the defences relied on under the
arbitration proceedings and the question of marital
rights interpose a bar against them.

4. The arbitration proceedings, which were intro-
duced in evidence by the defendants, were instituted
under our statutory regulations as existing in 1866, and
embraced in sections 4134 to 4156, inclusive, of our code
of 1863. The submission, to which is signed the names
of Pitt M. McLeroy; Martha F. Travis (now Allen);
James W. McLeroy; W. J. Gay; M. B. DeVaughn;
and Martha McLeroy, individually and as guardian for
Emily H. McLeroy (afterwards Martin) and T. E. B.
McLeroy, shows that the controversy was between
said guardian and her wards concerning her illegal
loans of their money to James W. McLeroy and W. J.
Gay of $3,992.06 and $1,215.23, respectively, and her
expenditure of $4,504.40 on her own account of other
money belonging to them. So far as the wards are
concerned, the submission " bears its death mark on
its face." The law only allows guardians, as legal
representatives, to submit to arbitration matters of

controversy with *third* persons touching the estate or property of the wards.   Code of 1863, §4134; of 1882, §4225; whereas, in this case, the submission shows on its face that the guardian was a party to the arbitration *in her individual right*, as was her bondsman, M. B. DeVaughn, also; and that no next friend or guardian *ad litem* was appointed to represent the interests of the wards.   Therefore the entire arbitration was a nullity as to them, for want of jurisdiction over their persons and property, and could not be used in evidence against them.   *Poullain vs. Poullain*, 79 *Ga.* 11.

The fact that the award was entered on the minutes of the superior court only gives it "the force and effect of a judgment or decree of said court."   Code of 1863, §4151.   And nothing is clearer than that "the judgment of a court having no jurisdiction of the person and subject-matter, or void for any other cause, is a mere nullity, and may be so held in *any* court when it becomes material to the interest of the parties to consider it."   Code of 1863, §3513; of 1882, §3594.

The arbitration proceedings are also void as against Pitt M. McLeroy and Martha F. Travis (now Allen),. whose names appear as subscribers to the submission. Both of these parties testified at the trial of this case that they did not sign the submission, nor authorize any one to do so for them, nor had any knowledge of the arbitration until just prior to the commencement of this suit; and there was no evidence to the contrary. The defendants, in the third ground of their motion for a new trial, allege that they objected to these parties testifying in their own behalf, on account of Martha McLeroy and M. B. DeVaughn, parties in interest, being dead.   It is unnecessary to decide whether this

evidence was incompetent or not, because the record shows that the court below did not certify this ground to be true, and hence this court cannot consider the objection as having been made. *Olive vs. Herrington*, 33 *Ga.* 584; *Clements vs. Lee*, 47 *Ga.* 625(3); *Smith vs. Summerlin*, 48 *Ga.* 425; *Kent vs. Plumb*, 57 *Ga.* 207(3), 209; *Puffer vs. Peabody*, 59 *Ga.* 295; *Compton vs. Wells*, 63 *Ga.* 301; *Georgia Land Co. vs. Humphries*, 66 *Ga.* 754; *Smith vs. State*, 67 *Ga.* 769; *Flournoy vs. Wardlaw*, 67 *Ga.* 379; *Thorpe vs. Wray*, 68 *Ga.* 359(10), 369; *Lyman vs. State*, 69 *Ga.* 404; *DeVaughn vs. Armstrong*, 69 *Ga.* 771; *Brand vs. Kennedy*, 71 *Ga.* 707; *Fisher vs. State*, 73 *Ga.* 595(6); *Marshall vs. State*, 74 *Ga.* 26(5); *Green vs. State*, 74 *Ga.* 373(2); *Graham vs. Mitchell*, 78 *Ga.* 310.

But the plaintiffs in error further contend that T. E. B. McLeroy, one of the wards, Pitt M. McLeroy and Martha F. Travis have ratified the arbitration and award; the former by his suing out execution against M. B. DeVaughn on the award, and the transfer of the same to the Citizens' Bank, which is the real party defendant in this case; and the latter by receiving their respective share of the money awarded to them; and that the last named parties are also estopped by having executed a deed to M. B. DeVaughn for their remainder interest in the land now sued for. A ratification implies knowledge. Therefore, to bind a person by a ratification of an illegal or void act, it must be shown that such person had full knowledge, at the time of the alleged ratification, of the facts which make such act illegal or void. 3 Wait's Act. and Def. 470–2; *McLean vs. Clark*, 47 *Ga.* 25(14), 73; Billings *vs.* Morrow, 7 Cal. 171; 68 Am. Dec. 728, 735; Reese *vs.* Medlock, 27 Tex. 120; 84 Am. Dec. 611; Vincent *vs.* Rather, 31 Tex. 77; 98 Am. Dec. 516; Fuller *vs.* Ellis, 39 Vt. 345;

94 Am. Dec. 327, and note 331. And the burden of proving a ratification is on the party asserting it. Reese *vs.* Medlock, *supra;* Note to Gulick *vs.* Grover, 97 Am. Dec. 728; 3 Wait's Act. and Def. 472.

It is true, if the award involves the interest of T. E. B. McLeroy in the land which his heirs are now suing for, that his suit for the money awarded to him in the adjustment of his money demand against his guardian, and the transfer of the judgment which he obtained, would also be a ratification of the award upon his interest in the land; because it is a plain elementary principle of law, sustained by all authority, that he could not ratify what was advantageous to him and repudiate what was against his interests. Hence it becomes important to consider whether the award disposed of his remainder interest in this land. If it did, his heirs are bound; and if it did not, they are not bound. The award shows that the arbitrators, in considering the rights of the wards, confined their decision to what the guardian and those to whom she had illegally loaned her wards' money should pay to the wards in satisfaction of their *money* demands. *The award is wholly silent as to their remainder interests in the land now sued for.* How, then, can T. E. B. McLeroy's ratification of the award, to the extent of his interest therein, deprive him or his heirs of the right to sue for his remainder interest in this land, to which the award directs no conveyance, nor makes any mention expressly or by implication, and to which M. B. DeVaughn, through whom the defendants claim, acquired no deed? While it was agreed in the submission that DeVaughn would buy the life-interest of Mrs. McLeroy in the land, and pay over the consideration to the wards, if the entire remainder was also conveyed to him, the arbitrators did not so direct. They awarded that she should sell to

DeVaughn, in payment of the money claims of her wards, her life-estate in the land now sued for, *and other land which she held in her own name,* together with her farming utensils, etc. ; and that the legatees and remaindermen *named in the award* (which does not include the names of the wards or of Pitt M. McLeroy and Martha F. Travis) should convey their interests to DeVaughn, on condition of his future support of Mrs. McLeroy. And DeVaughn agreed to the award, by accepting the *individual* deed of Mrs. McLeroy and the deed of others who claimed as remaindermen, which left the remainder interests of the wards untouched by the award or by either of said deeds.

It follows, necessarily, even if Pitt M. McLeroy and Martha F. Travis had received a portion of the money under the award, with knowledge of the facts, in place of their share in the money to which they were entitled upon their arrival at age before the submission to arbitration was made on December 27th, 1866, that it would have been a ratification of the award only to the extent of estopping them from suing the guardian, or her bondsmen, and the borrowers for their portion of the money last mentioned; because no other interest of theirs was passed upon by the award. But the defendants submitted no evidence whatever, and none was adduced from any other source, to show that these parties received any money after the award. On the contrary, the testimony of these parties shows that they received no money from De-Vaughn after the award, and knew nothing about the arbitration and award until just prior to the commencement of this suit. The defendants' alleged objection, in the ground of their motion for a new trial, to the testimony of said parties is immaterial, aside from the reason above mentioned, first, because the ground was not certified by the court below ; and secondly, because if it

had been certified, it was unnecessary for these parties
to disprove a ratification which the defendants, upon
whom rested the burden of proof, had utterly failed to
show.

In answer to the deed purporting to have been signed
by them in favor of M. B. DeVaughn for their remain-
der interest in the land now sued for, Pitt M. McLeroy
and Martha F. Travis filed an affidavit that their sig-
natures to the deed were forgeries.    The defendants
replied that the signatures were genuine.    The court
charged the jury that the burden was on the defendants
to overcome, by proof, the effect of the affidavit, "so that
you will believe that their affidavit is false and that really
they did sign it," *i. e.* the deed.    We think this part of
the charge was erroneous.    Where an affidavit of forgery
of a deed is filed, it simply leaves the burden of proof
upon the party offering the deed, notwithstanding the
fact that it has been recorded.    The record of the deed
does not assist him when the affidavit of forgery has
been filed.    He must prove the execution of it just as
though it had never been recorded.    *Hanks vs. Phillips,*
39 *Ga.* 550 ; *Mills vs. May,* 42 *Ga.* 623 ; *Hill vs. Nisbet,*
58 *Ga.* 586; *Holland vs. Carter,* 79 *Ga.* 139.    Gener-
erally he must prove it by the subscribing witnesses, if
they are in life and are accessible, and if they can re-
member the facts and circumstances of its execution ;
but the proof of the execution is not confined exclu-
sively to the subscribing witnesses.    If they are dead
or inaccessible, or have forgotten the facts and circum-
stances of the execution of the deed, or deny the execu-
tion of the deed, other proof may be resorted to to
prove its execution.    The affidavit of forgery is not
proof by the parties making such affidavit.    It only
forms the issue on the question of forgery, and the jury

should not consider the affidavit of forgery as evidence, any more than they would consider the affidavit of forgery in a claim case, or any other affidavit the foundation of a legal proceeding, or any of the pleadings in the case. But while, for these reasons, it was error to instruct the jury in the language quoted above, the error is made harmless by the fact that the verdict is right under the evidence on the issue raised by the question of forgery. *Crawford vs. Gaulden,* 33 *Ga.* 182, citing prior cases of this court; *Lester vs. Georgia Railroad & Bkg. Co.,* 42 *Ga.* 245; *Whitehead vs. Arline,* 43 *Ga.* 221; *Guerin vs. Danforth,* 45 *Ga.* 493; *Young vs. Moody,* 48 *Ga.* 498; *Akin vs. Freeman,* 49 *Ga.* 61; *Allen vs. Woodson,* 50 *Ga.* 53(5), 69; *Saxon vs. Sheppard,* 54 *Ga.* 286; *Hughes vs. Western Railroad,* 61 *Ga.* 131; *Danielly vs. Colbert,* 71 *Ga.* 218, 222; *Graham vs. Mitchell,* 78 *Ga.* 310; *Smith vs. Wilkes and McDuffie Counties,* 79 *Ga.* 125; *Merck vs. American Freehold, etc. Co.,* 79 *Ga.* 213(4), 233, 234.

5. The next question, which is one of no small moment, involves the marital rights of the husbands of Mrs. Travis (now Allen) and Mrs. Gay, two of the testator's daughters. It will be well to remember, in the outset of this question, that there is no distinction whatever, in this State, between real and personal property as regards the marital rights of the husband; and that all cases of personalty will, under the same facts, apply to realty and *vice versa.* Act of December 23d, 1789; Cobb's Dig. 305; *Hooper vs. Howell,* 50 *Ga.* 168–9, s. c. 52 *Ga.* 322–3; *Archer vs. Guill,* 67 *Ga.* 195; *Grote vs. Pace,* 71 *Ga.* 231–5; *Sterling vs. Sims,* 72 *Ga.* 51.

Before our married woman's act of December 13th, 1866, the marital rights of the husband only attached absolutely to the real and personal property to which the wife had *the legal title and possession. Bell vs. Bell,*

DeVaughn *et al.* *vs.* McLeroy *et al.*

1 *Ga.* 637, 640; *Pope vs. Tucker,* 23 *Ga.* 484, 486–7; *Prescott vs. Jones,* 29 *Ga.* 58; *Shipp vs. Wingfield,* 46 *Ga.* 599; *Cain vs. Furlow,* 47 *Ga.* 674; *Hooper vs. Howell, supra;* and *Bradley vs. Saddler,* 54 *Ga.* 681, 685. The possession, of course, may be beneficial or constructive, as where it is held by a guardian or agent in the *absolute* right of the ward or principal (Stewart's Husband and Wife, §169); or where the property *has been divided,* but the wife has not yet taken actual possession. *Hooper vs. Howell,* 52 *Ga.* 315, 323.

All legacies, devises and distributive shares in an immediate estate are upon the footing of *choses in action,* until the right of possession accrues to the legatees, devisees and heirs by a division. *Bell vs. Bell, supra; Sayre vs. Flournoy,* 3 *Ga.* 541, 546–7; *Chappell vs. Causey,* 11 *Ga.* 25; *Hooper vs. Howell, Grote vs. Pace,* and *Sterling vs. Sims, supra; Langmade vs. Tuggle,* 78 *Ga.* 770; Stewart *vs.* Stewart, 31 Ala. 207(6), 216; Hayward *vs.* Hayward, 20 Pick. 519, *et seq.;* Poindexter *vs.* Blackburn, 1 Ired. Eq. 286; Schuyler *vs.* Hoyle, 5 Johns. Ch. 196, approved in *Chappell vs. Causey,* 11 *Ga.* 30; Lewis *vs.* Price, 3 Rich. Eq. 172; Stewart's Husb. and Wife, §§169, 175.

Likewise are estates in remainder, whether vested or contingent, and residuary estates. Stewart's Husband and Wife, §§171, 175, and cases cited in the notes thereto; *McGinnis vs. Foster,* 4 *Ga.* 377, 384; *Corley vs. Corley,* 22 *Ga.* 178; *Archer vs. Guill,* 67 *Ga.* 195; and the numerous authorities cited *infra,* under effect of assignment by W. J. Gay, one of the plaintiffs in the case at bar, of the remainder interest of his wife pending the life-estate.

The marital rights of the husband do not attach absolutely, but qualifiedly only, to the wife's legal and

v 82–45

equitable choses in action. By the marriage, in consonance with all the authorities, he acquires a mere vested right to reduce them into his possession, as husband, during the coverture. But this right is optional with him, and he cannot be forced by his creditors to assert it. *Sayre vs. Flournoy,* 3 *Ga.* 541; *Grote vs. Pace,* 71 *Ga.* 231(2), 234; Freeman on Executions, §127; Schouler on Domestic Rel. (2d ed.) 116, 122–3; Stewart's Husb. and Wife, §177. Therefore, if the husband dies before the wife, or is divorced *a vinculo,* without having made a reduction into his possession, she is entitled, by survivorship, to all her continuing choses in action, to wit: her bonds, notes, judgments, stocks, legacies, devises, distributive shares, and estates in remainder, reversion and residuum, as absolutely as if she had never married. *Bell vs. Bell,* 1 *Ga.* 644, bottom of page; *Sayre vs. Flournoy,* 3 *Ga.* 547, 550; *Stephens vs. Beal,* 4 *Ga.* 319; *Chappell vs. Causey,* 11 *Ga.* 25; Hayward *vs.* Hayward, 20 Pick. 517, 519–531; Parsons *vs.* Parsons, 9 N. H. Rep. 309; 47 Am. Decis. 362, 368; *Barclay vs. Waring,* 58 *Ga.* 93; Stewart's Husb. and Wife, §176; Stewart on Marriage and Divorce, §445; Note to Boykin *vs.* Rain, 65 Am. Dec. 358. And if the husband survives the wife, he, without reducing her choses into possession, would then take the title thereto absolutely by inheritance. *McGinnis vs. Foster,* 4 *Ga.* 377, 384; *Lee vs. Wheeler,* 4 *Ga.* 541; *Bryan vs. Rooks,* 25 *Ga.* 622; 71 Am. Dec. 194; *Murdock vs. Mitchell,* 30 *Ga.* 76, 77; 76 Am. Dec. 634; *Carswell vs. Schley,* 56 *Ga.* 110; *Langmade vs. Tuggle,* 78 *Ga.* 770.

The case of *Corley vs. Corley,* 22 *Ga.* 178, shows that a number of slaves were given in trust for the grantor's daughter *and her children,* during her life, and after her death to be equally divided among said children, which made the children joint usees for life with their mother,

and remaindermen after her death, as under the deed construed in the case of *Franke vs. Berkner*, 67 *Ga.* 264, that the marital rights of the husband of one of the children, while entitling him to the possession of his wife's share as a joint usee for life, did not attach absolutely to his wife's remainder interest; and that, therefore, his receipt to the life-tenant for some of the slaves, which he specified as the share of himself and his wife, was not such a union of possession and right of possession after the death of the life-tenant as would bar the wife's equity, because no legal or equitable distribution of the slaves had then been made among the remaindermen.

And in the case of *McGinnis vs. Foster*, 4 *Ga.* 377, 384, which is somewhat similar to the case at bar, it was held that the vested remainder of the married daughter was upon the same footing as a chose in action; and that, as she died before acquiring the right of possession, her husband then took her interest absolutely as her heir free from distribution. Now suppose it had been the husband who died, and the wife had survived, before she acquired the right of possession, what would have been the necessary result? Plainly, we think, that the wife would have taken her remainder interest upon the termination of the life-estate as if she were a *feme sole*.

The cases of *Rogers vs. Cunningham*, 51 *Ga.* 40, and *Findley vs. Sasser*, 62 *Ga.* 177, are seemingly opposed to the above mentioned authorities. We believe, however, that an analysis of them will greatly weaken, if not destroy, their opposing force; and that even if they were directly in point, they should not be allowed to stand, as the great preponderance of authority and the better reason are against them. The facts of the case of *Rogers vs. Cunningham* show that Mrs. Gallie

had a vested remainder under the marriage settlement of her parents, that she first married a Mr. Porcher, with whom she made a settlement to protect this remainder from his marital rights *when it commenced in possession upon the termination of the life-estate;* that she survived Mr. Porcher without having any child by him, and afterwards married Mr. Gallie without a settlement; that she died childless in 1854, which was before the death of the life-tenant under the first settlement mentioned, leaving her husband in life; and that he subsequently made a will devising all of his property, but without specifying this remainder interest of his wife's, and died before the aforesaid life-tenant. The court held that the settlement with the first husband became executed by his death without leaving a child, which vested the legal title in the widow, and that upon her marriage to Mr. Gallie without a settlement, the legal title to the remainder, by the act of marriage, passed absolutely to him and to his devisees under his will. The court thus overlooked the legal title of the trustee under the marriage settlement of Mrs. Gallie's parents, and besides, erroneously treated a vested remainder (to which the wife had no possession or right of possession) as an estate in possession, for it relied on the cases of *Prescott vs. Jones,* 29 *Ga.* 58, and *Shipp vs. Wingfield,* 46 *Ga.* 598, which are cases where the wife had the legal title and enjoyed the actual possession of the property at the time of her marriage. These cases, then, are no authority for the opinion of the court that Mr. Gallie succeeded absolutely, upon his marriage, to the remainder interest of his wife. While this is true, it is also true that he had the absolute right, when he made his will, to devise this remainder. How did he acquire this right? The answer is plain. During his wife's life, his marital rights

attached qualifiedly to the remainder, which gave him the power to reduce it into his possession when the life-tenancy terminated; and doubtless this qualified right which was vested in him, would have attached to the property in the hands of his wife's grantee, if sold without his consent, because not even the legislature could deprive him of it. *Sperry vs. Haslam*, 57 *Ga.* 414. When she died in 1854, he was her *sole heir*, (Code of 1863, §2452,) and as such sole heir, *inherited* her right to the vested remainder, (*Ibid.* §2248,) which did away with the necessity of his making a reduction into his possession, as shown by the cases of *McGinnis vs. Foster, Lee vs. Wheeler, Bryan vs. Rooks, Murdoch vs. Mitchell, Carswell vs. Schley* and *Langmade vs. Tuggle, supra*, decided by this court; and Tune *vs.* Cooper, 4 Sneed (Tenn.), 296, which is directly in point.

The case of *Findley vs. Sasser* (the head-notes of which alone are published) is consistent with the rule for which we contend, if it be assumed that Findley, the husband, survived the tenant for life, and that the vesting spoken of as taking place at the time of the marriage was a qualified and not an absolute vesting. Both these assumptions should be made, as nothing to the contrary appears. Sasser, the purchaser from Find-ley, stood in the latter's place when the tenant for life died, and as he had purchased the life-estate also, was probably already in actual possession.

But suppose, for argument's sake, that the husband's marital rights attach absolutely to a vested remainder of the wife's after the executor's assent to the life-estate, on account of such assent putting the legal title in the remaindermen, as well as in the life-tenant, and making the possession of the life-tenant the possession of the remaindermen, (though in fact the latter have no possession, but only the right of immediate possession

upon the termination of the life-estate,) it is clear that the rule could only apply in cases where the executor has nothing to do but to pay the testator's debts. Hence it could not apply in the case at bar. Here the executor bought the land and put the life-tenant in possession under the direction of the testator. Such possession was like the possession of any life *cestui que trust*, a mere usufruct, and did not take the legal title and control of the property out of the executor's hands; for he was further directed by the testator, in case his widow, the life-tenant, remarried, to assume the management of said property, and apply the income to the best support of his widow and the raising and educating of his minor children; and also, after her death, to sell said property and divide the proceeds equally among all of his children. It therefore follows that the purchase of the property, coupled with these powers, or any one of them, created an executory trust during the life-tenancy, which, of necessity, kept the legal title 'in the executor during that time. *Burch vs. Burch,* 19 *Ga.* 185; *Griffin vs. Fleming,* 72 *Ga.* 697; and cases cited *supra,* under the head of trusts. And moreover, the direction to sell the land after the life-tenant's death and divide the proceeds equally among the children, made the latter's interest, during the life-tenancy, a chose in action, (Hemphill *vs.* Moody, 64 Ala. 47,) which, even if there had been no executory trust during the life-tenancy, would, of itself, prevent the possession of the life-tenant from being the possession of the remaindermen, because the former's estate would be a *freehold* and the latter's a *chose in action. Ibid.* So in any view of the case, it follows that the marital rights of the husbands of Mrs. Travis (now Allen) and Mrs. Gay did not, and could not, absolutely attach to the latter's remainder interests before the termination of the life-estate.

It is clear, then, that Mrs. Allen (formerly Mrs. Travis), who survived her first husband without his making a reduction into his possession, and married Mr. Allen after the married woman's act of 1866, is entitled to her interest in the land in dispute, in her own right, as if she had never married.   And this being true, it is now in order to consider the legal effect of W. J. Gay's assignment of his wife's remainder interest during the pendency of the life-estate and after the aforesaid married woman's act.   Nearly all the authorities agree, and we think correctly, that the husband's assignment for a valuable consideration, of such of the wife's choses in action as are capable of *immediate* reduction, although not actually and manually reduced to possession, would bar the wife's right of survivorship, because such an assignment is regarded as tantamount to a reduction into his possession.   But the great weight of authority is that an assignment by the husband, for a valuable consideration, of the wife's reversionary or remainder interests, whether vested or contingent, legal or equitable, on account of the very nature of such interests showing the impossibility of their being immediately reduced to possession, is not a reduction into possession by the husband.   To use the language of the Master of the Rolls in the justly celebrated case of Purdew *vs.* Jackson, 1 Russ. 28, " the assignment does not alter the nature of the thing.   It passes the interest of the assignor, but the subject remains what it was before—*a chose in action not reduced into possession.*"   And the conclusion of the cases is, that the assignee can only " stand," in common parlance, "in the shoes of the husband,"—that is, to *lose* if the husband dies leaving the wife surviving, or is divorced *a vinculo*, before such interests cease to be choses in action; and to *win* if the husband be in life, as husband, when the choses in action become property

in possession at the death of the life-tenant.  Both of these propositions, which have for their foundation simplicity, clearness and sound reasoning, are fully and ably sustained by the following English and American authorities :

Hornby *vs.* Lee, 2 Mad. 16, 20 ; Purdew *vs.* Jackson, 1 Russ. 1, 24–29, 42–71; Honner *vs.* Morton, 3 Russ. 65, 68–89; Ellison *vs.* Elvin, 13 Sim. 315–7 ; Wilkins *vs.* Gibson, L. R. 4 Eq. 162 ; Lynn *vs.* Bradley, 1 Met. (Ky.) 234; Hord *vs.* Hord, 5 B. Mon. (Ky.) 81; Wright *vs.* Arnold, 14 B. Mon. (Ky.) 638; 61 Am. Dec. 172 ; Dunn *vs.* Lancaster, 4 Bush. (Ky.) 581; 96 Am. Dec. 317; Sale *vs.* Saunders, 24 Miss. 37–8; 57 Am. Dec. 160–1; Needles *vs.* Needles, 7 Ohio St. 432, 437–441; 70 Am. Dec. 85, 87–90; Matheny *vs.* Guess, 2 Hill's Ch. (S. C.) 63, 66–7; Reese *vs.* Holmes 5 Rich. Eq. (S. C.) 531, 564–570 ; Larey *vs.* Beazley, 9 Rich. Eq. (S. C.) 119, 122–3; Duke *vs.* Palmer, 10 Rich. Eq. (S. C.) 380, 386–7; Caplinger *vs.* Sullivan, 2 Humph. (Tenn.) 548 ; 37 Am. Dec. 575, and note 580; Scott *vs.* Hix, 2 Sneed (Tenn.), 192 ; 62 Am. Dec. 458, and note 460 ; Crittenden *vs.* Tosey, 1 Head (Tenn.), 311 ; Browning *vs.* Headley, 2 Rob. (Va.) 340; 40 Am. Dec. 755; Hayes *vs.* Ewell, 4 Gratt. (Va.) 11, 15 ; Henry *vs.* Graves, 16 Gratt. (Va.) 244 ; Adams' Eq. (7 Am. ed.) 142; 1 Bishop's Law of Married Women, §154 ; Schouler's Domestic Rel. (2 ed.) 124–6 ; Stewart's Husb. and Wife, §§175,181 ; Story's Eq. Jur. §§1412, 1413 ; 3 Wait's Act. and Def. 641.

As W. J. Gay had the power, before the married woman's act of 1866, to make an assignment of his wife's remainder interest so as to operate as a right in his assignee to reduce the property into possession when the life-tenancy terminated, provided he was then in life as husband, it is clear that he could exercise the same power after said act, which was not intended, by retro-

spection, to impair any existing rights of the husband over the wife's property. *Sperry vs. Haslam,* 57 *Ga.* 412 ; *Archer vs. Guill,* 67 *Ga.* 195; *Grote vs. Pace,* 71 *Ga.* 231 ; *Comer & Co. vs. Allen,* 72 *Ga.* 1, 12.

6. From these views it will be seen that, in our opinion, all the plaintiffs in this action, in a proper suit, ought to recover except Gay, and that he is not entitled to recover. Having reached this conclusion, it therefore becomes necessary for us to pass upon the fifteenth ground of the motion for a new trial. That ground complains that the court refused to give the following written request to the jury : " In this form of action, none of the plaintiffs can recover unless they all can. If you find that any one of them is not entitled to recover, you must find for the defendants as to all of them." We think the court should have given this instruction to the jury as requested. The law in this State is, that where tenants in common bring a joint action for the recovery of land, in order to recover they must show that each and all of them have the right of entry and the right of possession at the time the action is brought, and at the time of the trial. If it is shown at the trial that either of them has no title, or has not the right of entry and possession, then the action fails, although the others may have title and the right of entry and possession. In the case of *Bohanan vs. Bond,* 32 *Ga.* 390, this court held that " a plaintiff in ejectment cannot recover on a joint demise, without proof of a joint interest in the lessors." In the case of *Etowah Mfg. Co. vs. Alford,* 78 *Ga.* 345, it was held: " Where, in an action of ejectment, a joint demise is laid in the declaration, evidence of a joint interest in the plaintiff's lessors must be given, and without it there can be no recovery on that demise ; and the same rule applies to the statutory form of action when used

as a substitute for the action of ejectment." In the case of *Echols vs. Sparks,* 79 *Ga.* 417, it was held : "On a joint demise in ejectment, the title proved must be joint, or the plaintiff cannot recover. They must establish the right of possession *in præsenti* to the premises, and such right must exist in each and all of them. If one of the plaintiffs has no title, the co-plaintiffs cannot recover, and such misjoinder of plaintiffs is ground for nonsuit." See also the authorities cited in this last case; also Pomeroy on Remedies and Remedial Rights, §§93-200; 2 Greenl. Ev. §317; Oxford *vs.* Propr's of Kennebec Purchase, 10 Mass. 179; Chandler *vs.* Simmons, 97 Mass. 508; Freeman on Cotenancy, §359; Hoyle *vs.* Stowe, 2 Dev. (N. C.) 318; Taylor *vs.* Taylor, 3 A. K. Marshall (Ky.), 944.

The verdict being for all of the plaintiffs, and one of them not being entitled to recover, the verdict was contrary to law, and a new trial necessarily follows.

Judgment reversed.*

*Note by the Court.—This case was argued at the last term. We did not have time to collect and investigate the authorities upon some of the questions involved and we therefore requested Joseph A. Cronk, Esq., of Savannah, Ga., a learned and industrious member of the bar of this court, to do this for us, and to prepare a provisional opinion. This he did. We were so well satisfied with the correctness and soundness of his work, that we have adopted the same as a part of this opinion, and it is embodied in the 2, 3, 4 and 5 heads of the opinion. We desire in this manner to show our appreciation of his courtesy and kindness in assisting us in the decision of these troublesome questions.